**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| ERIK RE'VOAL, | : | |
| | : | Civil Action No. 08-4649 (JLL) |
| Petitioner, | : | |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| MICHELLE R. RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

---

**APPEARANCES:**

Erik Re'Voal, Pro Se
#301246
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Christopher W. Hsieh, Esq.
Office of the Passaic County Prosecutor
401 Grand Street
Paterson, NJ 07505
Attorney for Respondents

**LINARES, District Judge**

Petitioner Erik Re'Voal, a prisoner currently confined at the New Jersey State Prison, Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Michelle Ricci, the Administrator of the New Jersey State Prison, and the Attorney General of New Jersey.

For the reasons stated herein, the petition must be denied.

**BACKGROUND**

A.   **Factual Background**

The relevant facts are set forth in the opinion of the
Superior Court of New Jersey, Appellate Division ("Appellate
Division"), in Petitioner's direct appeal.[1]  See Respondents'
Appendix "Ra" 3- Ra42.

> The evidence against the defendant was strong,
> notwithstanding some inconsistencies in the testimony
> of the State's witnesses.  The case dealt with a
> shooting of Willie Green, also known as "Cream Born,"
> during a drug sale or attempted drug transaction.[]
>
> On the early morning of December 20, 1993, Green
> and Anthony Fields (also known as "KR") were selling
> drugs on 12th Avenue near the corner of Graham Avenue
> in Paterson while a mutual friend of theirs, Charneice
> Forbes, looked on.  At about 4:00 a.m. a light blue or
> bluish-gray four-door Ford Escort came down Graham
> Avenue and made a left turn onto 12th Avenue.
> According to KR, the Escort's only occupant was the
> driver who had "[b]rown skin, kind of medium build,
> slender, with a not real thick but a nice little sized
> mustache with [a] black baseball cap and glasses."  KR
> later described the driver's hat as being a black knit
> "skully cap."  Forbes saw only the driver's profile,
> but noticed that he was wearing a black hat and that
> the arms of his glasses were brown or black.
>
> The driver stopped the car in the middle of the
> road, held up two fingers indicating that he wanted
> "two base," or two ten dollar bags of crack cocaine.
> As Green approached the car to tell the driver to park,
> the driver pulled away and drove down the block.  KR

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

and Green thereupon expressed concerns that "something [was] not right about this guy." They believed he might have planned to rob Green or take the drugs without paying for them.

About forty-five seconds to one minute later the car returned to the corner of 12th and Graham Avenues. Just as the driver pulled up to the corner for a second time, a mutual friend of both Cream and KR's, known on the street as "Ridge," arrived in his car. KR asked Ridge to move his car in front of the Escort on the opposite side of the street in case the driver attempted to do "something funny." Ridge thereupon moved his car down the block in front of the Escort.

Upon his return, Forbes got a better look at the driver. She said he was "dark skinned, he had brown framed glasses on and a black hat. He was wearing like a black sweater or jacket. He had a red T-shirt under it." Meanwhile, Green approached the Escort's driver-side window, and KR approached the car in order to back him up.

As KR approached the car, he noticed a Policemen's Benevolent Association-type sticker on the rear glass. He began to look for a police scanner or radio. KR also noticed that Green had been at the driver's window a minute to a minute and a half- a much longer time than the usual drug transaction normally took. KR then walked around the car looking both for evidence that the car might belong to the police and to make sure nothing suspicious was going on.

As KR approached the driver's side window, he saw the driver's "hands going under the seat" and pull out a black .38 caliber revolver. KR shouted "watch out he got a gun" and started to run from the scene. When he heard a shot fired, KR turned around and saw "Cream" lying in the street. He also saw that the driver was pointing the gun out the window before driving away from the scene. As the car drove away, KR saw the vehicle's license plate, "FID 54A."

KR jumped up and ran to a nearby payphone to call 911. He then ran back to Green and looked in his pockets for Cream's remaining drugs so that he would not be arrested for drug dealing upon his arrival at the hospital. Before heading down to the police

3

station, KR gave his drugs to Charneice Forbes, so they would not be found on him.

According to Forbes, KR first approached the car and spoke with the driver. She testified that KR "punched" the driver or "reached in like he was going to hit him" and that Cream was shot by the driver as he "was walking up to the car." Forbes saw the driver "trying to move away from the punch [or fall over from a punch and then] came back up" before shooting. She did not see KR actually punch the driver.

When she heard the shot, Forbes ran, but returned to see KR standing over "Cream," and "yelling his name, crying." Forbes then ran to tell Green's mother that he had been shot. When she returned to the scene, she gave a statement to the police. She described "a gray four door car," and described the driver as wearing "a black hat," having a "dark complexion [and wearing] prescription glasses."

Around the same time, Izell Harvey arrived on the scene. He dialed 911 from a local payphone, and told the operator "someone was shot" and tried to repeat the license plate number that KR was "screaming." However, because Harvey was "in shock," he kept giving the wrong numbers, so KR took the phone and gave the police the license plate number himself.

Within a few minutes, the Paterson police arrived. Officer Louis De Old arrived on the scene just after 4:04 a.m., and obtained a description of the Escort and the driver which he reported to the dispatcher. Sergeant Paul Savastano also obtained a description of the driver from Forbes. According to Savastano, Forbes "told me that there was a black male, dark complexion, wearing a black wool hat and glasses that was operating [the Escort] who had driven by the scene." Soon after, an ambulance arrived and took Green to St. Joseph's Hospital where he was later pronounced dead.

The report on the car's license plates indicated that the vehicle belonged to Theresa Shirley of Fair Lawn. Fair Lawn Officer Michael Messina was dispatched to Shirley's residence to find out if the vehicle was there.

4

At about 4:40 a.m., Shirley informed Messina that she had "lent" the car to defendant and gave him defendant's Paterson address.  Shirley described defendant "as approximately five nine in height, thin and wearing glasses, short hair with a beard and mustache and dark skinned."  When Messina stated he needed to contact defendant about the car, Shirley told Messina that she had just spoken to him on the phone and he had told her "there's nothing wrong with the car" and it was "where he left it."  Shirley called defendant and verified that he was in his apartment in Paterson.  Messina returned to the patrol car and relayed the information to headquarters.[ ]

At around 5:00 a.m. Paterson police officer found the Escort in a parking lot behind defendant's apartment.  Officer John Boydell noticed that the car's windows were "clear," whereas the other cars in the lot had "fog or ice" on their windows.  After the car was secured, Officers Boydell, Izzo and Siedel entered defendant's apartment building.

When the officers got off the elevator on their way to defendant's apartment on the seventh floor, they saw defendant in the hall dressed in a bathrobe.  He invited the officers into his apartment.

When Detective Michael McNamara arrived at the apartment, defendant was wearing glasses and was telling the officers that his contact lenses were being cleaned and he had "just put on his glasses."  McNamara told defendant that he "was investigating a homicide . . . and that the plate number of [the Escort] was given . . . as being at the scene, and . . . asked him if he was home all night."  Defendant stated that he had used the car, but had been "with his girl friend, " next door neighbor Yvonne Pettway.  McNamara asked defendant to accompany him to the station to answer some questions.  Defendant said "he [d]idn't mind" doing so, and was taken to Paterson police headquarters.  The Escort was towed to headquarters and placed in a lot behind the building.

At about 6:13 a.m., while the four witnesses were waiting to give their statements in the station's roll call room, defendant was escorted into the building. Upon seeing defendant, Forbes shouted "over and over,"

5

"[t]hat's that m .... f..... right there" and "[t]hat's him right there."  In Forbes' words:

> Well, we heard the door like open and close and I turned around and I seen the man who shot "Cream Born" there and I was like, "That's the m.... f..... right there."

At trial, when Forbes was further questioned about the incident, the following was developed:

Q:  When you heard the door open, you turned and looked at the door?

A:  Yes.

Q.  Did anybody tell you to look at the door?

A:  No.  The officer told us not to look at the door, but I'm nosy.

Q:  When you looked over at the door, who did you see?

A:  I saw the shooter, and I kept saying over and over and over again, "That's him right there."

Q:  Did anybody tell you to identify that person?

A:  No.

Q:  Did anybody tell you who that person was?

A:  No.

Q:  Did anybody tell you anything about that person?

A:  No.

Defendant was not brought into the room so that Forbes or any of the other witnesses could get a better look at him.

According to the testimony of Officer Kevin Kaufman, who escorted the defendant into the police station, the "easie[st] route" of getting defendant up

6

> to the third-floor detective bureau for questioning was
> through the station's back entrance, past the roll call
> room's glass doors and up the elevator.  He did not
> know that witnesses to the shooting had been seated in
> the roll call room at the time.

See Appellate Division Opinion, Ra3- Ra10.

**B.   <u>Procedural Background</u>**

A Passaic County Grand Jury returned an indictment charging Petitioner with one count of murder; one count of possession of a weapon, a handgun, with purpose to use it unlawfully; and one count of unlawful possession of a handgun without a permit, all in violation of New Jersey state law.

Trial was held in Passaic County from February 17 through March 5, 1998.  Petitioner was found guilty, and on May 8, 1998, was sentenced to life imprisonment with a 30-year period of parole ineligibility.

Petitioner appealed.  On March 14, 2001, the Appellate Division affirmed the conviction and sentence.  Petitioner filed a petition for certification with the New Jersey Supreme Court, which was denied on January 8, 2002.

On April 23, 2002, Petitioner filed a motion for post-conviction relief (PCR) in the sentencing court.  The judge held a hearing for the motion, which resulted in an evidentiary hearing being held on February 22, 2006.  After the evidentiary hearing, the judge issued a 26-page letter opinion on April 16, 2006, denying the PCR motion in its entirety.  The Appellate

Division affirmed the denial on January 30, 2008.  Petitioner's petition for certification to the New Jersey Supreme Court was denied on April 8, 2008.

Petitioner filed this habeas petition on September 17, 2008. Petitioner was advised of his rights pursuant to <u>Mason v. Meyers</u>, 208 F.3d 414 (3d Cir. 2000), on October 6, 2008.  On February 27, 2009, an Order to Answer was issued to Respondents.  Respondents filed an Answer to the petition and the available state court record on or about April 21, 2009.  Petitioner applied for <u>pro bono</u> counsel in November of 2009, and asked for a copy of the answer.  His motion for counsel was denied on June 18, 2010, and a copy of the answer was served on July 12, 2010.  Petitioner did not file a reply to the answer; however, he did file an application for reconsideration of the denial of the motion for counsel.

C.   **Petitioner's Claims**

Petitioner cites six grounds for relief in his habeas petition:

1.   Trial counsel was ineffective because he opened the door to elicitation of other crimes testimony.

2.   Trial counsel was ineffective because he failed to request a limiting instruction regarding other crimes testimony to which counsel had opened the door.

8

3.   Trial counsel was ineffective because he failed to request an instruction on imperfect self-defense.

4.   Trial counsel was ineffective because he failed to advise Petitioner of the maximum sentencing exposure thereby resulting in Petitioner's rejection of the state's plea offer.

5.   The trial court deprived Petitioner of due process when it failed to provide the jury a limiting instruction on the use of other crimes testimony.

6.   The trial court deprived Petitioner of due process when it failed to instruct the jury on imperfect self defense.

(Petition, ¶ 12).

### 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merit s in state court proceedings, the writ shall not issue unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application

10

of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. <u>See Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. <u>See</u> <u>Chadwick v. Janecka</u>, 302 F.3d 107, 116 (3d Cir. 2002) (citing <u>Weeks v. Angelone</u>, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. <u>See</u> <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert.</u> <u>denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). <u>See</u> <u>also</u> <u>Schoenberger v. Russell</u>, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal case law, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits

notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierlev, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## DISCUSSION

## A.   Ineffective Assistance of Counsel (Grounds 1-4).

### 1.   Petitioner's Claims

Petitioner argues that: "Although the trial court had reserved a ruling on the admissibility of testimony regarding crack pipes found in Petitioner's apartment, during his examination of the state's first witness, trial counsel opened the door to elicitation of testimony regarding the crack pipes." (Ground 1).  He further contends that after counsel "opened the door" to the testimony regarding crack pipes, counsel failed to

request a limiting instruction on the use of other crimes testimony.  (Ground 2).

Petitioner also argues that counsel should have requested an instruction on imperfect self-defense, as Petitioner "might have honestly but unreasonably believed that his life was in danger and acted in response with deadly force."  (Ground 3).  Finally, Petitioner argues that counsel advised Petitioner that he was facing 30 years if convicted at trial, not life imprisonment, and that if he had known that he could receive a life sentence, he would have accepted the State's plea of 25 years, with a 12 ½ year parole ineligibility term.  (Ground 4).

2.  <u>Applicable Supreme Court Precedent</u>

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687. First, the defendant must "show that counsel's representation

13

fell below an objective standard of reasonableness." Id. at 687-88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance. See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

3.   State Court Review of Petitioner's Claims

Petitioner's grounds regarding ineffective assistance of counsel were presented to the state courts in his PCR motion. Petitioner's claims were denied after an evidentiary hearing was held in the trial court on the PCR motion, and testimony was taken from defense counsel. After the denial, Petitioner appealed, and the denial was affirmed by the Appellate Division. The Appellate Division held:

> Defendant received an evidentiary hearing on his petition for post-conviction relief (PCR) which was premised on claims of ineffective assistance of counsel. Both defense counsel, retained counsel, William Demarco, and assigned trial counsel, Larry Smith who replaced Demarco, testified, as did defendant, and Judge Joseph Riva wrote a comprehensive formal opinion which denied the petition.
>
> Judge Riva concluded that no limiting instruction was needed as to the drug paraphernalia found in defendant's apartment. Trial counsel explained why he had introduced the fact of its existence after the judge "reserved" decision on his motion to exclude the evidence and a potential witness, Chris Jenkins, indicated what his testimony would be. Counsel wanted to "minimize" the impact of the anticipated introduction of evidence on the State's case, as the fact defendant had paraphernalia would impact on the State's claim that the killing was part of a drug deal

15

that "went bad."   Judge Riva found that the evidence
was *res gestae* and no limiting instruction was
necessary.

We are satisfied that even if the evidence was not
properly admissible as *res gestae*, the admission
without an N.J.R.E. 404(b) limiting instruction would
not warrant a new trial, and that is so even if the
instruction should have been requested and given.
While the issue is now different than if presented in
an argument on direct appeal related to the absence of
the instruction, we now know that a request for a
limiting instruction would have been denied, and it is
the absence of a request that is critical for the
ineffectiveness of counsel contention.   In any event,
we are satisfied that even if a N.J.R.E. 404(b)
limiting instruction should have been requested, the
result of the trial would have been the same whether
given or not.   Moreover, Judge Riva rejected the
contention that "even if the 'other crimes' evidence
did not require a limiting instruction, the evidence
was harmful to his defense."

Pursuant to Rule 3:9-1, the plea offers would have
been discussed on the record by the time this case was
tried.   However, the transcript of status and pretrial
conferences were not presented on the PCR.

\* \* \*

The denial of PCR is affirmed for the reasons
expressed in Judge Riva's formal opinion of April 26,
2006, as supplemented herein.

State v. Revoal, 2008 WL 239146 (N.J. App. Div. Jan. 30,

2008)(unpubl.).

The PCR judge's opinion was more specific than the Appellate

Division opinion.  The PCR judge, who was also the trial judge,

cited Strickland throughout his opinion, and examined

Petitioner's trial counsel claims in turn.  After explaining the

Strickland and relevant New Jersey cases, the PCR judge continued

16

to demonstrate why counsel was not deficient by looking at the Petitioner's claims and rendering them meritless.  As the claims were rendered meritless, it was clear to the PCR judge that counsel could not be deemed ineffective by deficient performance.

For example, as to Petitioner's claims regarding counsel "opening the door" to other crimes evidence (Ground One), the PCR judge held:

> Defendant's argument that his trial counsel was deficient in failing to properly argue for suppression of the other crimes evidence, relating to drug paraphernalia found in defendant's apartment, is also without merit.  In PCR counsel's brief, he claims that because defendant's consent to search was illegally obtained, the search of defendant's apartment was illegal and the seized evidence would have been suppressed if trial counsel had so moved.  In support of his claim, counsel asserts that the following events occurred at police headquarters.  Defendant informed the police he wanted to speak to an attorney.  The police then stopped questioning defendant and sent him back to a cell.  Ten minutes later, they came back and asked defendant to sign a consent to search form without a lawyer present.  The police only asked defendant to sign the form evidencing that he read it. Defendant did not agree to a search.

> Remarkably, however, counsel's version of what happened at police headquarters was not corroborated by defendant at the hearing.  In fact, defendant failed to present any evidence that would lead me to conclude that defendant's consent to search was illegally obtained by the police.  As such, there is no basis for me to conclude that the evidence would have been suppressed if trial counsel had so moved.

> I further refuse to accept defendant's argument that, in examining Theresa Shirley, his trial counsel was deficient by "opening the door" to "other crimes" evidence, see N.J.R.E. 404(b), relating to the drug paraphernalia and then failing to request a limiting instruction.  At trial, defendant's counsel initially

17

argued that admissibility of the drug paraphernalia
evidence was unduly prejudicial to defendant.  Thus, I
prevented the prosecutor from commenting on this
evidence in his opening statement, which benefitted
defendant.  At the time I made my ruling, I anticipated
that defendant's counsel would request a hearing
outside the jury's presence at an appropriate time
during the trial so that I could decide defendant's
claim.  Because no request was made, there was no
hearing.  Instead counsel elicited from Shirley the
drug paraphernalia evidence even though it bolstered
the State's theory that the murder resulted from a
"bad" drug transaction.  Nevertheless, I conclude that
the State would have been permitted to present this
evidence because it "relates directly to the crimes for
which the defendant was being tried and its admission
served to paint a complete picture of the relevant
criminal transaction."  Simply put, the challenged
evidence was not "other crimes" evidence.

(Respondents' Exhibit B, at Da151-153, Opinion of Judge Riva

dated April 26, 2006, hereinafter "Riva Opinion")(internal

citations omitted).

Regarding the failure of counsel to request a limiting

instruction concerning evidence of the "other crimes" evidence

(Ground Two), the PCR judge held:

There is also no merit to defendant's argument
that his trial counsel was deficient in failing to
request a limiting instruction concerning the drug
paraphernalia evidence.  Defendant contends that the
introduction of this evidence was highly inflammatory
and portrayed defendant as a bad person without an
appropriate limiting instruction.  Considering
defendant was charged with murder, this evidence was
not highly inflammatory as defendant suggests.  In
reviewing the trial record, I am not persuaded that a
limiting instruction was required.  The drug
paraphernalia evidence was in the nature of res gestae
evidence, as to which a limiting instruction was not
necessary.

>     Nor am I persuaded by defendant's argument that
> even if the "other crimes" evidence did not require a
> limiting instruction, the evidence was harmful to his
> defense.  Because evidence is harmful to a defendant
> does not render it inadmissible.

(Riva Opinion, at Da154-155)(internal citation omitted).

As to Ground Three, in which Petitioner argues that counsel should have requested an imperfect self-defense charge, the PCR judge held:

>     Even though defendant's theory was
> misidentification, he contends here that trial counsel
> should have requested an imperfect self-defense charge.
> Imperfect self-defense may reduce a charge to
> manslaughter when a person uses deadly force under an
> honest but unreasonable belief that the force was
> necessary to defend himself.  The "Code of Criminal
> Justice does not provide an independent category of
> justification, excuse, or mitigation under the concept
> of imperfect self-defense."  A defendant may be
> entitled to have the jury consider evidence that his
> belief was honest, if not reasonable, if the evidence
> bears on his state of mind.  However, this entitlement
> is satisfied when the judge instructs the jury on
> alternate verdicts of murder.  Because I charged the
> jury to consider murder, passion/provocation
> manslaughter, aggravated manslaughter, reckless
> manslaughter and self-defense, my charge was adequate
> to allow the jury to convict on a lesser offense.  So
> viewed, defendant was not prejudiced by the lack of an
> imperfect self-defense charge.  Accordingly, I discern
> no legal basis to conclude that trial counsel's failure
> to request an imperfect self-defense charge was
> deficient.

(Riva Opinion, at Da156-157)(internal citations omitted).

Finally, Petitioner claims that he was not informed by his trial counsel that he faced a life sentence if convicted on the charge of murder (Ground Four).  The PCR judge noted that the plea offer called for a maximum sentence of twenty-five years

with 12 ½ years of parole ineligibility, for a plea of aggravated manslaughter.  The PCR judge also noted that Petitioner's claim that he would have accepted the State's plea offer if he had known he faced life "is belied by his assertion of innocence." The PCR judge went on to hold that:

> Defendant does not offer anything other than his bald assertion that he was not adequately advised of the potential sentence.  In contrast, defendant's trial counsel denied that they failed to inform him he faced a life sentence.[]  Consequently, there is no credible evidence supporting defendant's claims.

(Riva Opinion, at Da157-158)(internal footnote omitted).

As evidenced by the above, the PCR judge and Appellate Division examined Petitioner's claims raised in this habeas petition, on his PCR motion and through the state appellate process.

4.  <u>Analysis</u>

Petitioner's claims that counsel did not properly represent him are without merit.  As the state courts found, citing <u>Strickland</u>, a review of the record shows that counsel was competent and did not perform deficiently.  The decisions made by counsel, including decisions whether to call witnesses and in controlling the timing and manner in which potentially inculpatory evidence was elicited, were matters of counsel's strategy.

Further, the evidence against Petitioner at trial was substantial, and Petitioner cannot show prejudice.  As noted,

evidence against Petitioner included testimony of several eyewitnesses establishing that Petitioner drove to 12th Avenue to purchase narcotics; detailed descriptions of eyewitnesses of the Petitioner and the vehicle; two crack pipes that police recovered from Petitioner's apartment; and testimony that Petitioner was transported in the same vehicle as one of the victim's friends, and told the friend that he killed the victim and "would do it again" if he had to.

Therefore, as the record reveals that the state courts relied on the Strickland standard in evaluating Petitioner's ineffective counsel claims, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Petitioner's claims will be denied.

**B.  Petitioner's Remaining Claims (Grounds 5, 6).**

In Ground Five, Petitioner argues that his rights were violated by the trial court, which should have provided a limiting instruction on the use of other crimes testimony. In Ground Six, Petitioner argues that he was deprived of his due

21

process rights when the trial court failed to charge the jury on imperfect self-defense.

These claims were examined above in the context of ineffective assistance of counsel deprivations. However, this Court notes the following.

First, Petitioner's claim regarding the lack of the other crimes instruction and imperfect self-defense instruction were examined on direct appeal. The Appellate Division noted that, concerning the other crimes evidence, the trial court had discussed it with counsel, and, as defense counsel admitted, he had "opened the door" to the testimony in cross-examination of Theresa Shirley. Defense counsel had stated that such an instruction would be "moot" because he had brought the evidence to light during the cross-examination. The Appellate Division held that reversal was not required under the plain error rule, and that defendant's counsel specifically stated that no limiting instruction was necessary. The Appellate Division noted that despite its ruling, it did not evaluate that strategy under the guise of ineffective assistance of counsel, and would leave that for a PCR motion. (Appellate Division Opinion, Respondents' Exhibit B at Da26-27). As noted in this Opinion, the PCR judge held, and the Appellate Division affirmed, that the testimony was not "other crimes" evidence, and that counsel was not ineffective for eliciting the evidence.

22

Second, as to Petitioner's claim regarding imperfect self-defense, the Appellate Division on direct appeal held that the trial judge was not required to charge on imperfect self-defense without any request to do so.  (Appellate Division Opinion, Respondents' Exhibit B at Da40-41).  Again, this Court notes that in the context of an ineffective assistance of counsel claim, the PCR judge and the Appellate Division rejected Petitioner's argument that counsel was ineffective under this theory.

Regarding the claims that the jury charges were unconstitutional for purposes of this habeas petition, this Court notes that generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding:

> ... the only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73, (1991) (citations omitted).  Thus, the Due Process Clause is violated only where

23

"the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

In this case, this Court has reviewed the record, and notes that there is no contention that the jury charge wrongly described the burden of proof. The state courts did not find any error under state law with the charges, and this Court cannot ascertain any error that would rise to the level of a constitutional deprivation.

Further, a review of the record reveals that Petitioner has not demonstrated that his entire trial and conviction was so prejudiced by the charge as to violate the principles of fundamental fairness and due process. There was ample evidence against Petitioner to justify his conviction. Petitioner's conviction was based on a credibility determination by the jury, who chose to believe the State's witnesses over Petitioner's

24

defense.  Petitioner's conviction was neither fundamentally unfair, nor violated due process.  Therefore, these grounds for relief will be denied.

### CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

## CONCLUSION

For the reasons set forth above, the petition will be denied.  An appropriate order follows.


                                        /s/ Jose L. Linares
                                        JOSE L. LINARES
                                        United States District Judge

Dated: February 1, 2011

26